(Slip Opinion) OCTOBER TERM, 2011 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## SALAZAR, SECRETARY OF THE INTERIOR, ET AL. *v.* RAMAH NAVAJO CHAPTER ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

No. 11–551.  Argued April 18, 2012—Decided June 18, 2012

The Indian Self-Determination and Education Assistance Act (ISDA) directs the Secretary of the Interior to enter into contracts with willing tribes under which they will provide services such as education and law enforcement that the Federal Government otherwise would have provided.  It requires the Secretary to contract to pay the "full amount" of "contract support costs," 45 U. S. C. §§450j–1(a)(2), (g), subject to the availability of appropriations, §450j–1(b).  In the event of a contractual breach, tribal contractors are entitled to seek money damages under the Contract Disputes Act.

  In Fiscal Years (FYs) 1994 to 2001, respondent Tribes contracted with the Secretary to provide services.  During each of those FYs, Congress appropriated sufficient funds to pay any individual tribal contractor's contract support costs in full but did not appropriate enough to pay all tribal contractors collectively.  Unable to pay every contractor in full, the Secretary paid the Tribes on a uniform, pro rata basis.  Respondents sued under the Contract Disputes Act for breach of contract.  The District Court granted the Government summary judgment.  The Tenth Circuit reversed, finding the Government liable to each contractor for the full contract amount.

*Held:* The Government must pay each Tribe's contract support costs in full.  Pp. 5−18.

  (a) In *Cherokee Nation of Okla.* v. *Leavitt*, 543 U. S. 631, this Court considered the Government's promise to pay contract support costs in ISDA self-determination contracts that made the Government's obligation "subject to the availability of appropriations," *id.*, at 634−637. The Government contended that Congress appropriated inadequate funds to fulfill its contractual obligations to the Tribes, while meeting

the agency's competing fiscal priorities. Because Congress appropriated sufficient legally unrestricted funds to pay the contracts, however, the Court held that the Government was obligated to pay those costs in full absent "something special about the promises," *id.*, at 637–638.

That conclusion followed directly from well-established principles of Government contracting law: When a Government contractor is one of several persons to be paid out of a larger appropriation sufficient in itself to pay the contractor, the Government is responsible to the contractor for the full amount due under the contract, even if the agency exhausts the appropriation in service of other permissible ends. See *Ferris* v. *United States*, 27 Ct. Cl. 542, 546. That is so "even if an agency's total lump-sum appropriation is insufficient to pay all" of its contracts. *Cherokee Nation*, 543 U. S., at 637. This principle safeguards both the expectations of Government contractors and the long-term fiscal interests of the United States. Contractors need not keep track of agencies' shifting priorities and competing obligations; rather, they may trust that the Government will honor its contractual promises. And the rule furthers "the Government's own long-run interest as a reliable contracting partner in the myriad workaday transaction of its agencies." *United States* v. *Winstar Corp.*, 518 U. S. 839, 883. Pp. 5–8.

(b) The principles underlying *Cherokee Nation* and *Ferris* control here. Once "Congress has appropriated sufficient legally unrestricted funds to pay the contracts at issue, the Government normally cannot back out of a promise on grounds of 'insufficient appropriations,' even if the contract uses language such as 'subject to the availability of appropriations,' and even if an agency's total lump-sum appropriation is insufficient to pay all the contracts the agency has made." *Cherokee Nation*, 543 U. S., at 637. That condition is satisfied here, because Congress made sufficient funds available to pay any individual contractor in full. Pp. 8–10.

(c) The Government attempts to distinguish *Ferris* and *Cherokee Nation* on the ground that they involved unrestricted, lump-sum appropriations, while Congress here appropriated "not to exceed" a certain amount for contract support costs. The effect of the appropriations in each case, however, was identical: the agency remained free to allocate funds among multiple contractors, so long as the contracts served the purpose Congress identified. The "not to exceed" language still has legal effect; it prevents the Secretary from reprogramming other funds to pay contract support costs, thereby protecting funds that Congress envisioned for other Bureau of Indian Affairs programs.

Section 450j–1(b), which specifies that the Secretary is not required

to reduce funding for one tribe's programs to make funds available to another tribe, does not warrant a different result. Consistent with ordinary Government contracting principles, that language merely underscores the Secretary's discretion to allocate funds among tribes. It does not alter the Government's legal obligation when the Secretary fails to pay.

The Government's remaining counterarguments are unpersuasive. First, it suggests that the Secretary could violate the Anti-Deficiency Act, which prevents federal officers from making or authorizing an expenditure or obligation exceeding an amount available in an appropriation. That Act applies only to government officials, however, and does not affect the rights of citizens contracting with the Government. Second, the Government argues that permitting respondents to recover from the Judgment Fund would circumvent Congress' intent to cap total expenditures for contract support costs. But ISDA expressly provides that tribal contractors may sue for "money damages" under the Contract Disputes Act, and any ensuing judgments are payable from the Judgment Fund. See *Cherokee Nation*, 543 U. S., at 642. Third, the Government invokes cases in which courts have rejected contractors' attempts to recover for amounts beyond the maximum appropriated by Congress for a particular purpose. See, *e.g.*, *Sutton* v. *United States*, 256 U. S. 575. However, *Sutton* involved a specific line-item appropriation for an amount beyond which the sole contractor could not recover. This case involves several contractors, each of whom contracted within the lump-sum amount Congress appropriated for all contractors. Unlike the sole contractor in *Sutton*, they cannot reasonably be expected to know how much remained available of Congress' lump-sum appropriation. Finally, the Government claims that legislative history suggests that Congress approved of pro rata distribution, but "indicia in committee reports and other legislative history as to how funds should or are expected to be spent do not establish any legal requirement on the agency." *Lincoln* v. *Vigil*, 508 U. S. 182, 192. Pp. 11–17.

(d) This case is the product of two decisions in some tension: Congress required the Secretary to accept every qualifying ISDA contract, promising "full" funding for all contract support costs, but then appropriated insufficient funds to pay in full each tribal contractor. Responsibility for the resolution of that situation, however, is committed to Congress. Pp. 17–18.

644 F. 3d 1054, affirmed.

SOTOMAYOR, J., delivered the opinion of the Court, in which SCALIA, KENNEDY, THOMAS, and KAGAN, JJ., joined. ROBERTS, C. J., filed a dissenting opinion, in which GINSBURG, BREYER, and ALITO, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 11–551

## KEN L. SALAZAR, SECRETARY OF THE INTERIOR, ET AL., PETITIONERS *v.* RAMAH NAVAJO CHAPTER ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

[June 18, 2012]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

The Indian Self-Determination and Education Assis-
tance Act (ISDA), 25 U. S. C. §450 *et seq.*, directs the
Secretary of the Interior to enter into contracts with will-
ing tribes, pursuant to which those tribes will provide
services such as education and law enforcement that
otherwise would have been provided by the Federal Gov-
ernment. ISDA mandates that the Secretary shall pay
the full amount of "contract support costs" incurred by
tribes in performing their contracts. At issue in this case
is whether the Government must pay those costs when
Congress appropriates sufficient funds to pay in full any
individual contractor's contract support costs, but not
enough funds to cover the aggregate amount due every
contractor. Consistent with longstanding principles of
Government contracting law, we hold that the Govern-
ment must pay each tribe's contract support costs in full.

I

A

Congress enacted ISDA in 1975 in order to achieve

"maximum Indian participation in the direction of educational as well as other Federal services to Indian communities so as to render such services more responsive to the needs and desires of those communities."   25 U. S. C. §450a(a).  To that end, the Act directs the Secretary of the Interior, "upon the request of any Indian tribe . . . to enter into a self-determination contract . . . to plan, conduct, and administer" health, education, economic, and social programs that the Secretary otherwise would have administered.  §450f(a)(1).

As originally enacted, ISDA required the Government to provide contracting tribes with an amount of funds equivalent to those that the Secretary "would have otherwise provided for his direct operation of the programs." §106(h), 88 Stat. 2211.  It soon became apparent that this secretarial amount failed to account for the full costs to tribes of providing services.  Because of "concern with Government's past failure adequately to reimburse tribes' indirect administrative costs," *Cherokee Nation of Okla.* v. *Leavitt*, 543 U. S. 631, 639 (2005), Congress amended ISDA to require the Secretary to contract to pay the "full amount" of "contract support costs" related to each self-determination contract, §§450j–1(a)(2), (g).[1]  The Act also provides, however, that "[n]otwithstanding any other provision in [ISDA], the provision of funds under [ISDA] is subject to the availability of appropriations."  §450j–1(b).

Congress included a model contract in ISDA and di-

––––––––––

[1] As defined by ISDA, contract support costs "shall consist of an amount for the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management, but which . . . (A) normally are not carried on by the respective Secretary in his direct operation of the program; or (B) are provided by the Secretary in support of the contracted program from resources other than those under contract."  §450j–1(a)(2).  Such costs include overhead administrative costs, as well as expenses such as federally mandated audits and liability insurance.  See *Cherokee Nation of Okla.*, 543 U. S., at 635.

rected that each tribal self-determination contract "shall . . . contain, or incorporate [it] by reference." §450*l*(a)(1). The model contract specifies that "'[s]ubject to the availability of appropriations, the Secretary shall make available to the Contractor the total amount specified in the annual funding agreement'" between the Secretary and the tribe. §450*l*(c), (model agreement §1(b)(4)). That amount "'shall not be less than the applicable amount determined pursuant to [§450j–1(a)],'" which includes contract support costs. *Ibid.;* §450j–1(a)(2). The contract indicates that "'[e]ach provision of [ISDA] and each provision of this Contract shall be liberally construed for the benefit of the Contractor . . . .'" §450*l*(c), (model agreement §1(a)(2)). Finally, the Act makes clear that if the Government fails to pay the amount contracted for, then tribal contractors are entitled to pursue "money damages" in accordance with the Contract Disputes Act. §450m–1(a).

B

During Fiscal Years (FYs) 1994 to 2001, respondent Tribes contracted with the Secretary of the Interior to provide services such as law enforcement, environmental protection, and agricultural assistance. The Tribes fully performed. During each FY, Congress appropriated a total amount to the Bureau of Indian Affairs (BIA) "for the operation of Indian programs." See, *e.g.,* Department of the Interior and Related Agencies Appropriations Act, 2000, 113 Stat. 1501A–148. Of that sum, Congress provided that "not to exceed [a particular amount] shall be available for payments to tribes and tribal organizations for contract support costs" under ISDA. *E.g., ibid.* Thus, in FY 2000, for example, Congress appropriated $1,670,444,000 to the BIA, of which "not to exceed $120,229,000" was allocated for contract support costs. *Ibid.*

During each relevant FY, Congress appropriated sufficient funds to pay in full any individual tribal contractor's contract support costs. Congress did not, however, appropriate sufficient funds to cover the contract support costs due all tribal contractors collectively. Between FY 1994 and 2001, appropriations covered only between 77% and 92% of tribes' aggregate contract support costs. The extent of the shortfall was not revealed until each fiscal year was well underway, at which point a tribe's performance of its contractual obligations was largely complete. See 644 F. 3d 1054, 1061 (CA10 2011). Lacking funds to pay each contractor in full, the Secretary paid tribes' contract support costs on a uniform, pro rata basis. Tribes responded to these shortfalls by reducing ISDA services to tribal members, diverting tribal resources from non-ISDA programs, and forgoing opportunities to contract in furtherance of Congress' self-determination objective. GAO, V. Rezendes, Indian Self-Determination Act: Shortfalls in Indian Contract Support Costs Need to Be Addressed 3–4 (GAO/RCED–99–150, 2009).

Respondent Tribes sued for breach of contract pursuant to the Contract Disputes Act, 41 U. S. C. §§601–613, alleging that the Government failed to pay the full amount of contract support costs due from FY 1994 through 2001, as required by ISDA and their contracts. The United States District Court for the District of New Mexico granted summary judgment for the Government. A divided panel of the United States Court of Appeals for the Tenth Circuit reversed. The court reasoned that Congress made sufficient appropriations "legally available" to fund any individual tribal contractor's contract support costs, and that the Government's contractual commitment was therefore binding. 644 F. 3d, at 1063–1065. In such cases, the Court of Appeals held that the Government is liable to each contractor for the full contract amount. Judge Hartz dissented, contending that Congress intended to set a

maximum limit on the Government's liability for contract support costs. We granted certiorari to resolve a split among the Courts of Appeals, 565 U. S. \_\_\_ (2012), and now affirm.[2]

## II

### A

In evaluating the Government's obligation to pay tribes for contract support costs, we do not write on a clean slate. Only seven years ago, in *Cherokee Nation*, we also considered the Government's promise to pay contract support costs in ISDA self-determination contracts that made the Government's obligation "subject to the availability of appropriations." 543 U. S., at 634–637. For each FY at issue, Congress had appropriated to the Indian Health Service (IHS) a lump sum between $1.277 and $1.419 billion, "far more than the [contract support cost] amounts" due under the Tribes' individual contracts. *Id.,* at 637; see *id.,* at 636 (Cherokee Nation and Shoshone-Paiute Tribes filed claims seeking $3.4 and $3.5 million, respectively). The Government contended, however, that Congress had appropriated inadequate funds to enable the IHS to pay the Tribes' contract support costs in full, while meeting all of the agency's competing fiscal priorities.

As we explained, that did not excuse the Government's responsibility to pay the Tribes. We stressed that the Government's obligation to pay contract support costs should be treated as an ordinary contract promise, noting that ISDA "uses the word 'contract' 426 times to describe the nature of the Government's promise." *Id.*, at 639. As even the Government conceded, "in the case of ordinary contracts . . . 'if the amount of an unrestricted appropriation is sufficient to fund the contract, the contractor is

---

[2] Compare 644 F. 3d 1054 (case below), with *Arctic Slope Native Assn., Ltd.* v. *Sebelius*, 629 F. 3d 1296 (CA Fed. 2010) (no liability to pay total contract support costs beyond cap in appropriations Act).

entitled to payment *even if the agency has allocated the funds to another purpose* or assumes other obligations that exhaust the funds.'" *Id.*, at 641. It followed, therefore, that absent "something special about the promises at issue," the Government was obligated to pay the Tribes' contract support costs in full. *Id.*, at 638.

We held that the mere fact that ISDA self-determination contracts are made "subject to the availability of appropriations" did not warrant a special rule. *Id.,* at 643 (internal quotation marks omitted). That commonplace provision, we explained, is ordinarily satisfied so long as Congress appropriates adequate legally unrestricted funds to pay the contracts at issue. See *ibid.* Because Congress made sufficient funds legally available to the agency to pay the Tribes' contracts, it did not matter that the BIA had allocated some of those funds to serve other purposes, such that the remainder was insufficient to pay the Tribes in full. Rather, we agreed with the Tribes that "as long as Congress has appropriated sufficient legally unrestricted funds to pay the contracts at issue," the Government's promise to pay was binding. *Id.,* at 637–638.

Our conclusion in *Cherokee Nation* followed directly from well-established principles of Government contracting law. When a Government contractor is one of several persons to be paid out of a larger appropriation sufficient in itself to pay the contractor, it has long been the rule that the Government is responsible to the contractor for the full amount due under the contract, even if the agency exhausts the appropriation in service of other permissible ends. See *Ferris* v. *United States*, 27 Ct. Cl. 542, 546 (1892); *Dougherty* v. *United States*, 18 Ct. Cl. 496, 503 (1883); see also 2 GAO, Principles of Federal Appropriations Law, p. 6–17 (2d ed. 1992) (hereinafter GAO Redbook).[3]  That is so "even if an agency's total lump-sum

---

[3] In *Ferris*, for instance, Congress appropriated $45,000 for the im-

appropriation is insufficient to pay *all* the contracts the agency has made." *Cherokee Nation*, 543 U. S., at 637. In such cases, "[t]he United States are as much bound by their contracts as are individuals." *Lynch* v. *United States*, 292 U. S. 571, 580 (1934) (internal quotation marks omitted). Although the agency itself cannot disburse funds beyond those appropriated to it, the Government's "valid obligations will remain enforceable in the courts." GAO Redbook, p. 6–17.

This principle safeguards both the expectations of Government contractors and the long-term fiscal interests of the United States. For contractors, the *Ferris* rule reflects that when "a contract is but one activity under a larger appropriation, it is not reasonable to expect the contractor to know how much of that appropriation remains available for it at any given time." GAO Redbook, p. 6–18. Contractors are responsible for knowing the size of the pie, not how the agency elects to slice it. Thus, so long as Congress appropriates adequate funds to cover a prospective contract, contractors need not keep track of agencies' shifting priorities and competing obligations; rather, they may trust that the Government will honor its contractual promises. *Dougherty*, 18 Ct. Cl., at 503. In such cases, if

---

provement of the Delaware River below Bridesburg, Pennsylvania. Act of Mar. 3, 1879, ch. 181, 20 Stat. 364. The Government contracted with Ferris for $37,000 to dredge the river. Halfway through Ferris' performance of his contract, the United States Army Corps of Engineers ran out of money to pay Ferris, having used $17,000 of the appropriation to pay for other improvements. Nonetheless, the Court of Claims found that Ferris could recover for the balance of his contract. As the court explained, the appropriation "merely impose[d] limitations upon the Government's own agents; . . . its insufficiency [did] not pay the Government's debts, nor cancel its obligations, nor defeat the rights of other parties." 27 Ct. Cl., at 546; see also *Dougherty*, 18 Ct. Cl., at 503 (rejecting Government's argument that a contractor could not recover upon similar facts because the "appropriation had, at the time of the purchase, been covered by other contracts").

an agency overcommits its funds such that it cannot fulfill its contractual commitments, even the Government has acknowledged that "[t]he risk of over-obligation may be found to fall on the agency," not the contractor. Brief for Federal Parties in *Cherokee Nation* v. *Leavitt*, O. T. 2004, No. 02–1472 et al., p. 24 (hereinafter Brief for Federal Parties).

The rule likewise furthers "the Government's own long-run interest as a reliable contracting partner in the myriad workaday transaction of its agencies." *United States* v. *Winstar Corp.*, 518 U. S. 839, 883 (1996) (plurality opinion). If the Government could be trusted to fulfill its promise to pay only when more pressing fiscal needs did not arise, would-be contractors would bargain warily—if at all—and only at a premium large enough to account for the risk of nonpayment. See, *e.g.,* Logue, Tax Transitions, Opportunistic Retroactivity, and the Benefits of Government Precommitment, 94 Mich. L. Rev. 1129, 1146 (1996). In short, contracting would become more cumbersome and expensive for the Government, and willing partners more scarce.

B

The principles underlying *Cherokee Nation* and *Ferris* dictate the result in this case. Once "Congress has appropriated sufficient legally unrestricted funds to pay the contracts at issue, the Government normally cannot back out of a promise to pay on grounds of 'insufficient appropriations,' even if the contract uses language such as 'subject to the availability of appropriations,' and even if an agency's total lump-sum appropriation is insufficient to pay *all* the contracts the agency has made." *Cherokee Nation*, 543 U. S., at 637; see also *id.*, at 638 ("[T]he Government denies none of this").

That condition is satisfied here. In each FY between 1994 and 2001, Congress appropriated to the BIA a lump-

sum from which "not to exceed" between $91 and $125 million was allocated for contract support costs, an amount that exceeded the sum due any tribal contractor. Within those constraints, the ability to direct those funds was "'committed to agency discretion by law.'" *Lincoln* v. *Vigil*, 508 U. S. 182, 193 (1993) (quoting 5 U. S. C. §701(a)(2)). Nothing, for instance, prevented the BIA from paying in full respondent Ramah Navajo Chapter's contract support costs rather than other tribes', whether based on its greater need or simply because it sought payment first.[4] See *International Union, United Auto., Aerospace & Agricultural Implement Workers of Am.* v. *Donovan*, 746 F. 2d 855, 861 (CADC 1984) (Scalia, J.) ("A lump-sum appropriation leaves it to the recipient agency (as a matter of law, at least) to distribute the funds among some or all of the permissible objects as it sees fit"). And if there was any doubt that that general rule applied here, ISDA's statutory language itself makes clear that the BIA may allocate funds to one tribe at the expense of another. See §450j–1(b) ("[T]he Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization under this [Act]"). The upshot is that the funds appropriated by Congress were legally available to pay any individual tribal contractor in full. See 1 GAO Redbook, p. 4–6 (3d ed. 2004).

The Government's contractual promise to pay each tribal contractor the "full amount of funds to which the contractor [was] entitled," §450j–1(g), was therefore binding. We have expressly rejected the Government's argument that "the tribe should bear the risk that a total

––––––––––

[4] Indeed, the Indian Health Service once allocated its appropriations for new ISDA contracts on a first-come, first-serve basis. See Dept. of Health and Human Services, Indian Self-Determination Memorandum No. 92–2, p. 4 (Feb. 27, 1992).

lump-sum appropriation (though sufficient to cover its own contracts) will not prove sufficient to pay *all* similar contracts." *Cherokee Nation*, 543 U. S*.,* at 638. Rather, the tribal contractors were entitled to rely on the Government's promise to pay because they were "not chargeable with knowledge" of the BIA's administration of Congress' appropriation, "nor [could their] legal rights be affected or impaired by its maladministration or by its diversion." *Ferris*, 27 Ct. Cl., at 546.

As in *Cherokee Nation*, we decline the Government's invitation to ascribe "special, rather than ordinary" meaning to the fact that ISDA makes contracts "subject to the availability of appropriations."[5] 543 U. S., at 644. Under our previous interpretation of that language, that condition was satisfied here because Congress appropriated adequate funds to pay in full any individual contractor. It is important to afford that language a "uniform interpretation" in this and comparable statutes, "lest legal uncertainty undermine contractors' confidence that they will be paid, and in turn increase the cost to the Government of purchasing goods and services." *Ibid.* It would be particularly anomalous to read the statutory language differently here. Contracts made under ISDA specify that "'[e]ach provision of the [ISDA] and each provision of this Contract shall be liberally construed for the benefit of the Contractor. . . .'" §450*l*(c), (model agreement §1(a)(2)). The Government, in effect, must demonstrate that its reading is clearly required by the statutory language. Accordingly, the Government cannot back out of its contractual promise to pay each Tribe's full contract support costs.

_____

[5] The Government's reliance on this statutory language is particularly curious because it suggests it is superfluous. See Brief for Petitioners 30–31 (it is "unnecessary" to specify that contracts are "subject to the availability of appropriations" (internal quotation marks omitted)); see also Reply Brief for Petitioners 7 ("*[A]ll* government contracts are contingent upon the appropriations provided by Congress").

### III
### A

The Government primarily seeks to distinguish this case from *Cherokee Nation* and *Ferris* on the ground that Congress here appropriated "not to exceed" a given amount for contract support costs, thereby imposing an express cap on the total funds available. See Brief for Petitioners 26, 49. The Government argues, on this basis, that *Ferris* and *Cherokee Nation* involved "contracts made against the backdrop of unrestricted, lump-sum appropriations," while this case does not. See Brief for Petitioners 49, 26.

That premise, however, is inaccurate. In *Ferris*, Congress appropriated "[f]or improving Delaware River below Bridesburg, Pennsylvania, forty-five thousand dollars." 20 Stat. 364. As explained in the Government's own appropriations law handbook, the "not to exceed" language at issue in this case has an identical meaning to the quoted language in *Ferris*. See GAO Redbook, p. 6–5 ("Words like 'not to exceed' are not the only way to establish a maximum limitation. If the appropriation includes a specific amount for a particular object (such as 'For Cuban cigars, $100'), then the appropriation is a maximum which may not be exceeded"). The appropriation in *Cherokee Nation* took a similar form. See, *e.g.,* 108 Stat. 2527–2528 ("For expenses necessary to carry out . . . ISDA [and certain other enumerated Acts], $1,713,052,000"). There is no basis, therefore, for distinguishing the class of appropriation in those cases from this one. In each case, the agency remained free to allocate funds among multiple contractors, so long as the contracts served the purpose Congress identified.

This result does not leave the "not to exceed" language in Congress' appropriation without legal effect. To the contrary, it prevents the Secretary from reprogramming other funds to pay contract support costs—thereby protecting funds that Congress envisioned for other BIA

programs, including tribes that choose not to enter ISDA contracts. But when an agency makes competing contractual commitments with legally available funds and then fails to pay, it is the Government that must bear the fiscal consequences, not the contractor.

B

The dissent attempts to distinguish this case from *Cherokee Nation* and *Ferris* on different grounds, relying on §450j–1(b)'s proviso that "the Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe." In the dissent's view, that clause establishes that each dollar allocated by the Secretary reduces the amount of appropriations legally available to pay other contractors. In effect, the dissent understands §450j–1(b) to make the legal availability of appropriations turn on the Secretary's expenditures rather than the sum allocated by Congress.

That interpretation, which is inconsistent with ordinary principles of Government contracting law, is improbable. We have explained that Congress ordinarily controls the availability of appropriations; the agency controls whether to make funds from that appropriation available to pay a contractor. See *Cherokee Nation*, 543 U. S., at 642–643. The agency's allocation choices do not affect the Government's liability in the event of an underpayment. See *id.*, at 641 (when an "'unrestricted appropriation is sufficient to fund the contract, the contractor is entitled to payment *even if the agency has allocated the funds to another purpose*'").[6] In *Cherokee Nation*, we found those ordinary

_____

[6]The dissent's view notwithstanding, it is beyond question that Congress appropriated sufficient unrestricted funds to pay any contractor in full. The dissent's real argument is that §450j–1(b) reverses the applicability of the *Ferris* rule to ISDA, so that the Secretary's allocation of funds to one contractor reduces the legal availability of funds to others. See *post,* at 4 (opinion of ROBERTS, C. J.) ("that the Secretary

principles generally applicable to ISDA. See *id.*, at 637–
646. We also found no evidence that Congress intended
that "the tribe should bear the risk that a total lump-sum
appropriation (though sufficient to cover its own contracts)
will not prove sufficient to pay *all* similar contracts." *Id.*,
at 638 (citing Brief for Federal Parties 23–25). The dis-
sent's reading, by contrast, would impose precisely that
regime. See *post,* at 4–5.

  The better reading of §450j–1(b) accords with ordinary
Government contracting principles. As we explained, *su-
pra,* at 9, the clause underscores the Secretary's discre-
tion to allocate funds among tribes, but does not alter the
Government's legal obligation when the agency fails to
pay. That reading gives full effect to the clause's text,
which addresses the "amount of funds provided," and
specifies that the Secretary is not required to reduce fund-
ing for one tribe to make "funds available" to another.
450j–1(b). Indeed, even the Government acknowledges
the clause governs the Secretary's discretion to distribute
funds. See Brief for Petitioners 52 (pursuant to §450j–
1(b), the Secretary was not obligated to pay tribes' "con-
tract support costs on a first-come, first-served basis, but
had the authority to distribute the available money among
all tribal contractors in an equitable fashion").

  At minimum, the fact that we, the court below, the

_____

*could have* allocated the funds to [a] tribe is irrelevant. What matters
is what the Secretary does, and once he allocates the funds to one tribe,
they are not available to another"). We are not persuaded that §450j–
1(b) was intended to enact that radical departure from ordinary Gov-
ernment contracting principles. Indeed, Congress has spoken clearly
and directly when limiting the Government's total contractual liability
to an amount appropriated in similar schemes; that it did not do so
here further counsels against the dissent's reading. See, *e.g.,* 25
U. S. C. §2008(j)(2) ("[i]f the total amount of funds necessary to provide
grants to tribes . . . for a fiscal year exceeds the amount of funds appro-
priated . . . , the Secretary shall reduce the amount of each grant
[pro rata]").

Government, and the Tribes do not share the dissent's reading of §450j–1(b) is strong evidence that its interpretation is not, as it claims, "unambiguous[ly]" correct. *Post,* at 7 (opinion of ROBERTS, C. J.). Because ISDA is construed in favor of tribes, that conclusion is fatal to the dissent.

C

The remaining counterarguments are unpersuasive. *First*, the Government suggests that today's holding could cause the Secretary to violate the Anti-Deficiency Act, which prevents federal officers from "mak[ing] or authoriz[ing] an expenditure or obligation exceeding an amount available in an appropriation." 31 U. S. C. §1341(a)(1)(A). But a predecessor version of that Act was in place when *Ferris* and *Dougherty* were decided, see GAO Redbook, pp. 6–9 to 6–10, and the Government did not prevail there. As *Dougherty* explained, the Anti-Deficiency Act's requirements "apply to the official, but they do not affect the rights in this court of the citizen honestly contracting with the Government." 18 Ct. Cl., at 503; see also *Ferris*, 27 Ct. Cl., at 546 ("An appropriation *per se* merely imposes limitations upon the Government's own agents; . . . but its insufficiency does not pay the Government's debts, nor cancel its obligations").[7]

*Second*, the Government argues that Congress could not have intended for respondents to recover from the Judgment Fund, 31 U. S. C. §1304, because that would allow the Tribes to circumvent Congress' intent to cap total

_____

[7]We have some doubt whether a Government employee would violate the Anti-Deficiency Act by obeying an express statutory command to enter a contract, as was the case here. But we need not decide the question, for this case concerns only the contractual rights of tribal contractors, not the consequences of entering into such contracts for agency employees.

expenditures for contract support costs.[8]  That contention is puzzling.  Congress expressly provided in ISDA that tribal contractors were entitled to sue for "money damages" under the Contract Disputes Act upon the Government's failure to pay, 25 U. S. C. §§450m–1(a), (d), and judgments against the Government under that Act are payable from the Judgment Fund, 41 U. S. C. §7108(a).[9]  Indeed, we cited the Contract Disputes Act, Judgment Fund, and Anti-Deficiency Act in *Cherokee Nation*, explaining that if the Government commits its appropriations in a manner that leaves contractual obligations unfulfilled, "the contractor [is] free to pursue appropriate legal remedies arising because the Government broke its contractual promise."  543 U. S., at 642.

*Third*, the Government invokes cases in which courts have rejected contractors' attempts to recover for amounts beyond the maximum appropriated by Congress for a particular purpose.  See, *e.g., Sutton* v. *United States*, 256 U. S. 575 (1921).  In *Sutton*, for instance, Congress made a specific line-item appropriation of $23,000 for the completion of a particular project.  *Id.*, at 577.  We held that the sole contractor engaged to complete that project could not recover more than that amount for his work.

The *Ferris* and *Sutton* lines of cases are distinguishable,

————————

[8] The Judgment Fund is a "permanent, indefinite appropriation" enacted by Congress to pay final judgments against the United States when, *inter alia*, "[p]ayment may not legally be made from any other source of funds."  31 CFR §256.1 (2011).

[9] For that reason, the Government's reliance on *Office of Personnel Management* v. *Richmond*, 496 U. S. 414 (1990), is misplaced.  In *Richmond*, we held that the Appropriations Clause does not permit plaintiffs to recover money for Government-caused injuries for which Congress "appropriated no money."  *Id.,* at 424.  *Richmond*, however, indicated that the Appropriations Clause is no bar to recovery in a case like this one, in which "the express terms of a specific statute" establish "a substantive right to compensation" from the Judgment Fund.  *Id.,* at 432.

however.    GAO Redbook, p. 6–18.    "[I]t is settled that
contractors paid from a general appropriation are not
barred from recovering for breach of contract even though
the appropriation is exhausted," but that "under a specific
line-item appropriation, the answer is different." *Ibid.*[10]
The different results "follo[w] logically from the old maxim
that ignorance of the law is no excuse." *Ibid.* "If Congress
appropriates a specific dollar amount for a particular
contract, that amount is specified in the appropriation act
and the contractor is deemed to know it." *Ibid.* This case
is far different. Hundreds of tribes entered into thousands
of independent contracts, each for amounts well within the
lump sum appropriated by Congress to pay contract sup-
port costs. Here, where each Tribe's "contract is but one
activity under a larger appropriation, it is not reasonable
to expect [each] contractor to know how much of that
appropriation remain[ed] available for it at any given
time." *Ibid.;* see also *Ferris*, 27 Ct. Cl., at 546.

*Finally*, the Government argues that legislative history
suggests that Congress approved of the distribution of
available funds on a uniform, pro rata basis. But "a fun-
damental principle of appropriations law is that where
Congress merely appropriates lump-sum amounts without
statutorily restricting what can be done with those funds,
a clear inference arises that it does not intend to impose
legally binding restrictions." *Lincoln*, 508 U. S., at 192
(internal quotation marks omitted). "[I]ndicia in commit-

_____

[10] Of course, "[t]he terms 'lump-sum' and 'line-item' are relative con-
cepts." GAO Redbook, p. 6–165. For example, an appropriation for
building two ships "could be viewed as a line-item appropriation in
relation to the broader 'Shipbuilding and Conversion' category, but it
was also a lump-sum appropriation in relation to the two specific
vessels included." *Ibid.* So long as a contractor does not seek payment
beyond the amount Congress made legally available for a given pur-
pose, "[t]his factual distinction does not affect the legal principle." *Ibid.*
See also *In re Newport News Shipbuilding & Dry Dock Co.*, 55 Comp.
Gen. 812 (1976).

tee reports and other legislative history as to how the funds should or are expected to be spent do not establish any legal requirements on the agency." *Ibid.* (internal quotation marks omitted). An agency's discretion to spend appropriated funds is cabined only by the "text of the appropriation," not by Congress' expectations of how the funds will be spent, as might be reflected by legislative history. *Int'l Union, UAW*, 746 F. 2d, at 860–861. That principle also reflects the same ideas underlying *Ferris*. If a contractor's right to payment varied based on a future court's uncertain interpretation of legislative history, it would increase the Government's cost of contracting. Cf. *Cherokee Nation*, 543 U. S., at 644. That long-run expense would likely far exceed whatever money might be saved in any individual case.

IV

As the Government points out, the state of affairs resulting in this case is the product of two congressional decisions which the BIA has found difficult to reconcile. On the one hand, Congress obligated the Secretary to accept every qualifying ISDA contract, which includes a promise of "full" funding for all contract support costs. On the other, Congress appropriated insufficient funds to pay in full each tribal contractor. The Government's frustration is understandable, but the dilemma's resolution is the responsibility of Congress.

Congress is not short of options. For instance, it could reduce the Government's financial obligation by amending ISDA to remove the statutory mandate compelling the BIA to enter into self-determination contracts, or by giving the BIA flexibility to pay less than the full amount of contract support costs. It could also pass a moratorium on the formation of new self-determination contracts, as it has done before. See §328, 112 Stat. 2681–291 to 292. Or Congress could elect to make line-item appropriations,

allocating funds to cover tribes' contract support costs on a contractor-by-contractor basis.  On the other hand, Congress could appropriate sufficient funds to the BIA to meet the tribes' total contract support cost needs.  Indeed, there is some evidence that Congress may do just that.  See H. R. Rep. No. 112–151, p. 42 (2011) ("The Committee believes that the Bureau should pay all contract support costs for which it has contractually agreed and directs the Bureau to include the full cost of the contract support obligations in its fiscal year 2013 budget submission").

The desirability of these options is not for us to say.  We make clear only that Congress has ample means at hand to resolve the situation underlying the Tribes' suit.  Any one of the options above could also promote transparency about the Government's fiscal obligations with respect to ISDA's directive that contract support costs be paid in full.  For the period in question, however, it is the Government—not the Tribes—that must bear the consequences of Congress' decision to mandate that the Government enter into binding contracts for which its appropriation was sufficient to pay any individual tribal contractor, but "insufficient to pay *all* the contracts the agency has made." *Cherokee Nation,* 543 U. S., at 637.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 11–551

KEN L. SALAZAR, SECRETARY OF THE INTERIOR,
ET AL., PETITIONERS *v*. RAMAH NAVAJO
CHAPTER ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE TENTH CIRCUIT

[June 18, 2012]

CHIEF JUSTICE ROBERTS, with whom JUSTICE GINSBURG, JUSTICE BREYER, and JUSTICE ALITO join, dissenting.

Today the Court concludes that the Federal Government must pay the full amount of contract support costs incurred by the respondent Tribes, regardless of whether there are any appropriated funds left for that purpose. This despite the facts that payment of such costs is "subject to the availability of appropriations," a condition expressly set forth in both the statute and the contracts providing for such payment, 25 U. S. C. §§450j–1(b), 450*l*(c) (Model Agreement §1(b)(4)); that payment of the costs for all tribes is "not to exceed" a set amount, *e.g.,* 108 Stat. 2511, an amount that would be exceeded here; and that the Secretary "is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe," §450j–1(b). Because the Court's conclusion cannot be squared with these unambiguous restrictions on the payment of contract support costs, I respectfully dissent.

The Indian Self-Determination and Education Assistance Act provides: "Notwithstanding any other provision in [the Act], the provision of funds under this [Act] is subject to the availability of appropriations . . . ." *Ibid.*

This condition is repeated in the Tribes' contracts with the Government. App. 206; see also §450*l*(c) (Model Agreement §1(b)(4)). The question in this case is whether appropriations were "available" during fiscal years 1994 through 2001 to pay all the contract support costs incurred by the Tribes. Only if appropriations were "available" may the Tribes hold the Government liable for the unpaid amounts.

Congress restricted the amount of funds "available" to pay the Tribes' contract support costs in two ways. First, in each annual appropriations statute for the Department of the Interior from fiscal year 1994 to 2001, Congress provided that spending on contract support costs for all tribes was "not to exceed" a certain amount. The fiscal year 1995 appropriations statute is representative. It provided: "For operation of Indian programs . . . , $1,526,778,000, . . . of which not to exceed $95,823,000 shall be for payments to tribes and tribal organizations for contract support costs . . . ." 108 Stat. 2510–2511. As the Court acknowledges, *ante,* at 11–12, the phrase "not to exceed" has a settled meaning in federal appropriations law. By use of the phrase, Congress imposed a cap on the total funds available for contract support costs in each fiscal year. See 2 General Accounting Office, Principles of Federal Appropriations Law, p. 6–8 (2d ed. 1992) (hereinafter GAO Redbook) ("[T]he most effective way to establish a maximum . . . earmark is by the words 'not to exceed' or 'not more than'").

Second, in §450j–1(b) itself—in the very same sentence that conditions funding on the "availability of appropriations"—Congress provided that "the Secretary [of the Interior] is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization under [the Act]." An agency may be required to shift funds from one object to another, within statutory limits, when doing so is

necessary to meet a contractual obligation. See 1 GAO Redbook, p. 2–26 (2d ed. 1991). But the "reduction" clause in §450j–1(b) expressly provides that the Secretary is "not required" to engage in such reprogramming to make one tribe's funds "available to another tribe." It follows that appropriations allocated for "programs, projects, or activities serving a tribe" are *not* "available" to another tribe, unless the Secretary reallocates them. Contrary to the Court's suggestion, *ante,* at 13–14, the Government shares this view that the "reduction" clause "specifically relieves the Secretary of any obligation to make funds available to one contractor by reducing payments to others." Brief for Petitioners 51 (citing *Arctic Slope Native Assn., Ltd.* v. *Sebelius*, 629 F. 3d 1296, 1304 (CA Fed. 2010), cert. pending, No. 11–83 (filed July 18, 2011)).

Given these express restrictions established by Congress—which no one doubts are valid—I cannot agree with the Court's conclusion that appropriations were "available" to pay the Tribes' contract support costs in full. Once the Secretary had allocated all the funds appropriated for contract support costs, no other funds could be used for that purpose without violating the "not to exceed" restrictions in the relevant appropriations statutes. The Court agrees. *Ante,* at 11–12. That leaves only one other possible source of funds to pay the disputed costs in this case: funds appropriated for contract support costs, but allocated to pay such costs incurred by other tribes. Those funds were not "available" either, however, because they were "funding for programs, projects, or activities serving a tribe," and the Secretary was not required to reduce such funding "to make funds available to another tribe." §450j–1(b).

In reaching a contrary conclusion, the Court fails to appreciate the full significance of the "reduction" clause in §450j–1(b). As construed by the Court, that clause merely confirms that the Secretary "may allocate funds to one

tribe at the expense of another." *Ante,* at 9. But as ex-
plained above, the clause does more than that: It also
establishes that when the Secretary does allocate funds to
one tribe at the expense of another, the latter tribe has no
right to those funds—the funds are not "available" to it.
The fact that the Secretary *could have* allocated the funds
to the other tribe is irrelevant. What matters is what the
Secretary actually does, and once he allocates the funds to
one tribe, they are not "available" to another.

The Court rejects this reading of the "reduction" clause,
on the ground that it would constitute a "radical departure
from ordinary Government contracting principles." *Ante,*
at 13, n. 6. But the fact that the clause operates as a
constraint on the "availability of appropriations" is evident
not only from its text, which speaks in terms of "funds
available," but also from its placement in the statute,
immediately following the "subject to the availability"
clause. Under the Court's view, by contrast, the "reduc-
tion" clause merely "underscores the Secretary's discretion
to allocate funds among tribes." *Ante,* at 13. There is,
however, no reason to suppose that Congress enacted the
provision simply to confirm this "ordinary" rule. *Ibid.* We
generally try to avoid reading statutes to be so "insig-
nificant." *TRW Inc.* v. *Andrews,* 534 U. S. 19, 31 (2001)
(internal quotation marks omitted).

The Court maintains that its holding is compelled by
our decision in *Cherokee Nation of Okla.* v. *Leavitt,* 543
U. S. 631 (2005). *Ante,* at 8. Like respondents here, the
tribes in *Cherokee Nation* sued the Government for unpaid
contract support costs under the Act. Congress had ap-
propriated certain sums to the Indian Health Service "[f]or
expenses necessary to carry out" the Act, *e.g.,* 108 Stat.
2527–2528, but—unlike in this case—those appropriations
"contained no relevant statutory restriction," 543 U. S., at
637. The Government in *Cherokee Nation* contended that
it was not obligated to pay the contract support costs as

promised, in light of the "reduction" clause in §450j–1(b). The Government argued that the clause "makes nonbinding a promise to pay one tribe's costs where doing so would require funds that the Government would otherwise devote to 'programs, projects, or activities serving . . . another tribe.'" *Id.,* at 641 (quoting §450j–1(b)).

We ruled against the Government, but not because of any disagreement with its reading of the "reduction" clause. The basis for our decision was instead that "the relevant congressional appropriations contained other *unrestricted* funds, small in amount but sufficient to pay the claims at issue." 543 U. S., at 641 (emphasis altered). Those funds were allocated for "'inherent federal functions,' such as the cost of running the Indian Health Service's central Washington office." *Id.,* at 641–642. They were not restricted by the "reduction" clause, because they were not funds for "'programs, projects, or activities serving . . . another tribe.'" *Id.,* at 641 (quoting §450j–1(b)). Nor were they restricted by the pertinent appropriations statutes, which, as noted, contained no relevant limiting language. See *ibid.* We therefore held that those funds— which we described as "unrestricted" throughout our opinion, *id.,* at 641, 642, 643, 647—were available to pay the disputed contract support costs.

As even the Tribes concede, *Cherokee Nation* does not control this case. Tr. of Oral Arg. 39 ("I don't think this case is controlled by *Cherokee*" (counsel for the Tribes)). The reason is not that the appropriations statutes in this case contained "not to exceed" caps while those in *Cherokee Nation* did not. The Court is correct that appropriating an amount "for" a particular purpose has the same effect as providing that appropriations for that purpose are "not to exceed" that amount. *Ante,* at 11. What makes this case different is where Congress drew the line. In *Cherokee Nation*, the statutes capped funding for "expenses necessary to carry out" the Act, a category that included

funding for both "inherent federal functions" and contract support costs. Accordingly, funding for one could be used for the other, without violating the cap. Here, by contrast, the statutes capped funding for contract support costs specifically. Thus, once the Secretary exhausted those funds, he could not reprogram other funds—such as funds for "inherent federal functions"—to pay the costs. With the caps in place, moreover, the "reduction" clause, as explained above, rendered unavailable the only possible source of funds left: funds already allocated for other contract support costs. Unlike in *Cherokee Nation*, therefore, there were no unrestricted funds to pay the costs at issue in this case. The Court's quotation from *Cherokee Nation* concerning "when an ' "*unrestricted* appropriation is sufficient to fund the contract," ' " *ante,* at 12 (emphasis added) (quoting *Cherokee Nation*, *supra*, at 641), is accordingly beside the point.

The Court also relies on *Ferris* v. *United States*, 27 Ct. Cl. 542 (1892). That case involved a government contract to dredge the Delaware River. When work under the contract stopped because funds from the relevant appropriation had been exhausted, a contractor sued the Government for breach of contract, and the Court of Claims held that he was entitled to recover lost profits. As the court explained, "[a] contractor who is one of several persons to be paid out of an appropriation is not chargeable with knowledge of its administration, nor can his legal rights be affected or impaired by its maladministration or by its diversion, whether legal or illegal, to other objects." *Id.,* at 546. That principle, however, cannot "dictate the result in this case." *Ante,* at 8. The statute in *Ferris* appropriated an amount "[f]or improving [the] Delaware River," which prevented spending for that purpose beyond the specified amount. 20 Stat. 364. But in that case, all funds appropriated for that purpose were equally available to all contractors. Here that is not true; §450j–1(b)

makes clear that funds allocated to one contractor are not available to another. Thus, the principle in *Ferris* does not apply.

It is true, as the Court notes, *ante,* at 10, that each of the Tribes' contracts provides that the Act and the contract "shall be liberally construed for the benefit of the Contractor." App. 203; see also §450*l*(c) (Model Agreement §1(a)(2)). But a provision can be construed "liberally" as opposed to "strictly" only when there is some ambiguity to construe. And here there is none. Congress spoke clearly when it said that the provision of funds was "subject to the availability of appropriations," that spending on contract support costs was "not to exceed" a specific amount, and that the Secretary was "not required" to make funds allocated for one tribe's costs "available" to another. The unambiguous meaning of these provisions is that when the Secretary has allocated the maximum amount of funds appropriated each fiscal year for contract support costs, there are no other appropriations "available" to pay any remaining costs.

This is hardly a typical government contracts case. Many government contracts contain a "subject to the availability of appropriations" clause, and many appropriations statutes contain "not to exceed" language. But this case involves not only those provisions but a third, relieving the Secretary of any obligation to make funds "available" to one contractor by reducing payments to others. Such provisions will not always appear together, but when they do, we must give them effect. Doing so here, I would hold that the Tribes are not entitled to payment of their contract support costs in full, and I would reverse the contrary judgment of the Court of Appeals for the Tenth Circuit.